UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANDRE ANDERSON,

        Petitioner,

v.                          CASE NO. 04-CV-40163-FL
                          HONORABLE PAUL V. GADOLA

PAUL RENICO,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Deandre Anderson has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition attacks Petitioner's state court convictions for assault with intent to rob while armed, first-degree criminal sexual conduct, first-degree home invasion, and possession of a firearm during the commission of a felony (felony firearm). Respondent urges the Court to deny the petition because Petitioner's claims "are either unexhausted, not cognizable upon federal habeas review, or without merit, and because the state court adjudications of his claims were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or an unreasonable determination of the facts." Answer in Opp'n to Pet. for Writ of Habeas Corpus, at 6. The Court agrees for reasons given below that Petitioner's claims do not warrant granting the writ of habeas corpus.

**I. Background**

On November 8, 2000, a circuit court jury in Wayne County, Michigan found Petitioner guilty of: two counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89; three

counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b; one count of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); and one count of felony firearm, MICH. COMP. LAWS § 750.227b.  The convictions arose from an incident that occurred early on June 30, 1998, when two men broke into a home, demanded money from the two female residents, and raped the women.  The victims were unable to identify the intruders because the men wore hoods and scarves over their faces.  However, the victims testified that one of the men was short and fat and the other man was medium tall and skinny.  The skinny man, who had a physical build and complexion like Petitioner, raped one victim, and the fat man raped the other victim.[1]

The victims' neighbors suspected that something was wrong and called the police when they saw an unfamiliar vehicle in the neighborhood and two men enter the back door of a house on Calvert Street.  The skinny man left the premises unnoticed, but the other man, Markevan (or Markenevan) Love, was captured in the victims' apartment.  A third man, Tony Carter, was found sleeping in the vehicle behind the residence.

The prosecution's position was that Petitioner was the skinny man.  DNA evidence on a vaginal swab taken from Victim #1 was consistent with Petitioner's DNA, and Petitioner implicated himself in letters he wrote to friends.  Petitioner testified that Tony Carter, Markevan Love, and a man named Deon dropped him off at his girlfriend's house before the crime supposedly occurred.

The trial court initially sentenced Petitioner to ten to twenty years in prison for assault with intent to rob while armed, twenty to thirty years for first-degree criminal sexual conduct, and ten to twenty years for first-degree home invasion.  The trial court then vacated these terms of

---

[1] For the sake of privacy, the Court will refer to the victims as Victim #1 and Victim #2.

imprisonment and sentenced Petitioner as a habitual offender to a term of twenty to thirty years in prison. The court sentenced Petitioner to a consecutive term of two years in prison for the felony firearm conviction.

Petitioner raised his habeas claims and a double jeopardy claim in an appeal of right. The Michigan Court of Appeals affirmed his convictions, but remanded the case for entry of an amended judgment of sentence indicating that there was one conviction for criminal sexual conduct supported by three alternate theories. *See People v. Anderson*, No. 233212 (Mich. Ct. App. Dec. 27, 2002). On June 30, 2003, the Michigan Supreme Court denied leave to appeal because it was not persuaded that the questions presented should be reviewed. *See People v. Anderson*, 468 Mich. 940; 664 N.W.2d 217 (2003) (table).

Petitioner signed and dated his habeas petition on June 1, 2004. The grounds for relief read:

I. Deandre Anderson's conviction should be reversed because over defense objection the trial court admitted inconsistent and overly prejudicial expert testimony concerning DNA analysis of the mixed sperm sample, without accompanying statistical analysis to indicate the likelihood that DNA of other persons in the relevant population would also match that in the mixed sperm sample and because the prosecutor mischaracterized the DNA evidence in arguing to the jury.

II. Defendant Anderson's conviction for felony-firearm should be reversed because there was insufficient evidence that he possessed a firearm.

## II. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable

>application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

>Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a 'watershed' rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1670 (2005).

**III. Discussion**

### A.  DNA Evidence and the Prosecutor's Comments

The first habeas claim alleges that the trial court erroneously admitted evidence on a DNA analysis of a mixed sperm sample and that the prosecutor mischaracterized the evidence.[2]

#### 1.  Admission of DNA Evidence

Petitioner contends that the admission of DNA evidence without a statistical interpretation of the evidence resulted in a miscarriage of justice.  Petitioner's attorney moved to exclude the evidence before the prosecution's expert witness testified about the evidence.  The trial court took the motion under advisement, but permitted the prosecutor to call her expert witness, who was a forensic serologist.  Petitioner contends that the forensic serologist's testimony was inconsistent, prejudicial, and a violation of state law, because the serologist was unable to provide a statistical analysis to indicate the likelihood that the DNA of other people in the relevant population would also match evidence found in the mixed sperm sample taken from the vaginal swab of Victim #1.

The Michigan Court of Appeals concluded on review of this claim that the trial court did not

---

[2]  Petitioner raised this issue solely as a matter of state law on direct appeal.  The doctrine of exhaustion of state remedies requires habeas petitioners to fairly present their claims in each appropriate state court as a matter of federal law before seeking a writ of habeas corpus.  *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  However, because Petitioner's claims lack merit, the Court will proceed to adjudicate Petitioner's claims rather than dismiss this case in its entirety for failure to exhaust state remedies.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Lyons v. Stovall*, 188 F.3d 327, 333 (6th Cir. 1999) ("Furthermore, it has been found that where 'the federal constitutional claim was plainly meritless and it would be a waste of time and judicial resources to require exhaustion,' nonexhaustion and procedural default should be excused.") (quoting *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991)).

abuse its discretion in admitting the evidence.  The court of appeals determined that the evidence met the requirements of state law in that the serologist "provided significant analytical or interpretive evidence through her testimony regarding the mixed sample calculations." *Anderson*, Mich. Ct. App. No. 233212, at 3.  The court of appeals further determined that any error in admitting the evidence was harmless.

"[F]ederal habeas review of state court evidentiary rulings is extremely limited." *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005) (citing *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990)).  State court rulings regarding the admission or exclusion of evidence usually may not be questioned on federal habeas review.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  An exception exists when violation of a state's evidentiary rule resulted in the denial of fundamental fairness, thereby violating due process.  *Id*.

Forensic serologist Stephanie Turek testified that DNA (deoxyribonucleic acid) is comprised of forty-six pairs of chromosomes and that on each chromosome are locations or loci, which are genes.  On each gene are alleles.  Eight different DNA locations comprise a DNA profile.  Statistical calculations are performed to determine how frequently that profile appears in the population.  (Tr. Nov. 6, 2000, at 11-12.)

Ms. Turek went to explain that, in a typical sexual assault case, she tries to separate the victim's vaginal cells from the suspect's sperm cells.  She stated that she can determine if more than one individual was involved in an assault, but it is impossible to separate the sperm cells of two men. (*Id.*, at 13-17.)

Ms. Turek analyzed blood samples from Petitioner, the two victims, Tony Carter, and

Markevan Love. She also analyzed a blood sample from the boyfriend of Victim #1, Lonnie Smith, because the victim admitted having sexual intercourse with Mr. Smith within twenty-four hours of the crimes.

Ms. Turek reached the following conclusions from her analysis of a vaginal swab taken from Victim #1: (1) Tony Carter and Markevan Love were not possible sources of semen on the vaginal sample; (2) if a person assumed that there was only one donor of sperm on the vaginal swab, Petitioner was excluded as a possible source of sperm; (3) if there was more than one donor of sperm, Petitioner could not be excluded as a possible source of the partial DNA profile detected on the vaginal swab, because the combination of alleles would mask the presence of Petitioner's alleles at some loci;[3] (4) the sperm cell fraction on the vaginal swab showed a mixture consistent with Lonnie Smith's DNA profile and a partial DNA profile from another individual; and (5) the alleles on the vaginal sample that were distinct from Petitioner's alleles were consistent with Mr. Smith's alleles, and the alleles that were distinct from Mr. Smith's alleles were consistent with Petitioner's or Victim #1's alleles. (*Id*., at 25-28.)

Ms. Turek was unable to provide a statistical frequency for the DNA profile found on the vaginal swab for Victim #1 because the evidence was a mixed sample. She could calculate only how frequently the alleles, and not necessarily the entire DNA profile, appear in a specific population. She stated that 180,000 African Americans in a random population could have contributed to the mixed sample and that her calculation was based on how frequently the combination of alleles are

---

[3] In other words, alleles can be lost or masked if there is more than one donor of sperm and one donor has a higher concentration of sperm cells than the other donor. (Tr. Nov. 6, 2000, at 26.)

found in the population. (*Id*. at 33-34, 49-50.)[4] Defense counsel used this testimony to his advantage by subsequently arguing to the jury that Petitioner's DNA did not match the DNA in the vaginal sample and that there were 180,000 reasonable doubts in the case. (Tr. Nov. 7, 2000, at 87-88.)

In summary, the serologist never testified that Petitioner's DNA definitely was found on the victim's vaginal swab. Rather, she stated that Petitioner could not be excluded as a source of the partial DNA profile detected on the vaginal swab of Victim #1 and that 180,000 other African Americans could have contributed to the mixed sample. Because the serologist adequately explained her analysis and its limitations, the Court concludes that the admission of DNA evidence was not fundamentally unfair. Petitioner's right to due process was not violated.

### 2. Harmless Error Analysis

The Michigan Court of Appeals recognized that, even if the evidence was admitted erroneously, the evidence was harmless:

> The two victims testified extensively regarding the acts that occurred in their apartment on June 30, 1998. The issue in this case became the identification of the assailant known as the "skinny guy ." Although neither witness was able to positively identify defendant as the skinny guy, the first victim testified that defendant had the same build as the skinny guy, and that the skinny guy attempted to disguise his voice, which was muffled. The second victim testified that the skinny guy had a similar build and complexion as defendant, and that the skinny guy may have been disguising his voice. Additionally, Martin Gaynor testified that defendant admitted he was with Tony Carter[5] and [Markevan] Love on June 30, 1998, but

---

[4] Petitioner is an African American.

[5] Carter was arrested in connection with this case; however, the DNA results positively excluded him as a contributor of the evidentiary samples taken from both victims.

8

> stated that he was only with Carter and Love for approximately twenty minutes before being dropped off at his girlfriend's house. Defendant told Gaynor that he knew Carter and Love were planning on robbing a house on Calvert for money and drugs. The prosecution also presented two letters, written by defendant, which related to the crimes involving the two victims in this case. Finally, after defense counsel asked the first victim why she believed defendant had anything to do with this case, she replied, "I told that [sic] because the guy MarKevin [sic] when he was arrested he said that it was Deandre. That's why Deandre got picked up for the DNA testing."

*Anderson*, Mich. Ct. App. No. 233212, at 3 (footnote in original). The court of appeals concluded that "there was sufficient other evidence from which the jury could find that the elements of the crime were proven beyond a reasonable doubt." *Id*.

This Court agrees, for reasons given by the state court, that any error in admitting the DNA evidence could not have had a "substantial and injurious effect or influence" on the jury's verdict and, therefore, was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Petitioner is not entitled to habeas relief on the basis of his evidentiary claim.

### 3. The Prosecutor's Arguments

Petitioner contends that the prosecutor misled the jury, referred to facts not in evidence, and mischaracterized the evidence by conclusively attributing to Petitioner the unidentified alleles in the mixed sample. "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on a claim of prosecutorial misconduct, Petitioner must demonstrate that the prosecutor's questions and remarks, taken in the context of the entire trial, were sufficiently prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637,

9

639, 643 (1974). It is not enough to show that the prosecutor's conduct was improper or even universally condemned. *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)), *cert. denied sub nom Bowling v. Haeberlin*, __ U.S. __, 125 S. Ct. 281 (2004). The Court can provide relief only if the conduct or statements were "so flagrant as to render the entire trial fundamentally unfair." *Id*. Four factors that courts must consider when determining flagrancy are:

> (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

*Id*. at 512-13. Furthermore, prosecutorial misconduct falls into the category of trial, rather than structural, errors and may be reviewed for harmless error. *Maurino v. Johnson*, 210 F.3d 638, 647 (6th Cir. 2000), *abrogated on other grounds by Harris v. Stovall,* 212 F.3d 940, 942-43 (6th Cir. 2000).

In her opening statement, the prosecutor said that a DNA report initially excluded Petitioner as the source of alleles. The prosecutor went on to explain that, after a blood sample from Lonnie Smith was obtained, it was determined that Petitioner could have been one of the persons who was responsible for the sperm sample. (Tr. Nov. 2, 2000, at 123-24.)

Petitioner interprets the prosecutor's comment about knowing the source of the other alleles as a reference to him. The statement in context reads:

> [A] DNA examination was conducted and because there were markers that we call alleoids (sic). There were certain alleoids (sic) present that were incompatible with Mr. Anderson's DNA profile. He was excluded as the source of

10

those alleoids (sic).

You will learn that after some time the police were able to obtain a blood sample from [Victim #1's] boyfriend. A young man named Lonnie Smith. And once they had his profile and were able to compare that with the information that they already had. The alleoids (sic) that could not be identified as Mr. Anderson alleoids (sic) of markers were in fact consistent with Mr. Smith. That is [Victim #1's] boyfriend.

Now the results of the DNA typing is ruled out. *Now that we know who is the source of these other alleoids*. We can't exclude Mr. Anderson. Mr. Anderson could have been one of the persons who is responsible for the sperm sample if you will. That we found in this evidence.

(*Id*.) (emphasis added.)

The Court believes that the italicized statement was a reference to Lonnie Smith's alleles, not Petitioner's alleles. The prosecutor appears to have been saying , "Now that we know Lonnie Smith was the source of the other alleles, we cannot eliminate the defendant as a possible source of the sperm on the mixed sample." Thus, the prosecutor's opening statement did not conclusively attribute certain alleles to Petitioner.

Relevant portions of the prosecutor's closing argument read as follows:

When a sample from Mr. Smith is obtained and Mr. Smith's DNA profile is determined, as well as [Victim #1's] DNA profile is determined, a sample from Deandre Anderson is obtained, and his profile is determined, and the results are when you look at those three individuals at the various sites on the DNA molecule that are tested, the evidence sample collected from [Victim #1's] vagina shows the presence of the alleles of all these individuals.

. . . .

Now the presence of Mr. Anderson's alleles in the evidentiary sample is some evidence from which you certainly can conclude, and we would submit the evidence should be fairly convincing, proof beyond a reasonable doubt, if you will, that he is that individual. Because his alleles are also present here.

> . . . .
>
> But the bottom line, folks, is, is every indication in the world this man is not being truthful when he says, I wasn't there. It wasn't me. It was him. Not only does the science make it him, his own writings make it him.
>
> . . . .
>
> The DNA testing, however, says, yeah, that could easily have been him because his alleles are present in the sample that was taken from her body.

(Tr. Nov. 7, 2000, at 61-62, 70, 79.)

The prosecutor overstated the evidence when she said that "science make[s] it him" and that Petitioner's alleles were present in the vaginal sample taken from Victim #1. The serologist merely testified that Petitioner could not be excluded as a source of sperm found on the victim's vaginal swab and that the alleles distinct from Mr. Smith's alleles on the vaginal swab were consistent with either Petitioner's or the victim's alleles.

Although the remarks were deliberately made, it does not appear that the remarks were intended to mislead the jury. The prosecutor later explained that the calculations for a mixed sample are not specific to an individual in the same way that statistical analyses are for DNA profiles. The prosecutor pointed out that calculations for mixed samples measure how many other persons have the same marker at the same site. (*Id*. at 96-97.) The prosecutor also acknowledged that 180,000 other people could have contributed to the mixed sample in evidence. (*Id*. at 96.)

Moreover, the trial court instructed the jurors that the attorneys' statements and arguments were not evidence and that they were meant only to help the jurors understand the evidence and their theories. The court stated that the jurors "should only accept things the lawyers say that are

supported by the evidence or by your own common sense and general knowledge." (*Id*. at 110.)

The trial court also instructed the jurors that they did not have to believe an expert witness's opinion, and that they should decide whether to believe the expert opinion and how important they thought it was. The court cautioned the jurors to consider whether the reasons given and the facts relied upon by the expert witness were true and whether the expert witness's opinion made sense when they considered the other evidence in the case. (*Id*. at 107.)

The other evidence against Petitioner was substantial. As explained above, there was sufficient evidence besides the DNA evidence from which the jury could find that the elements of the crime were proven beyond a reasonable doubt.

The Court therefore concludes that the prosecutor's comments about DNA evidence were not flagrant and did not render Petitioner's trial fundamentally unfair. Alternatively, the comments could not have had a "substantial and injurious effect or influence" on the jury's verdict and were harmless. *See Brecht v. Abrahamson*, 507 U.S. at 623.

### B. Sufficiency of the Evidence

The second and final habeas claim alleges that there was insufficient evidence produced at trial to support Petitioner's conviction for felony firearm. According to Petitioner, the evidence demonstrated that Markevan Love maintained possession and control of the firearm during the entire incident. The Michigan Court of Appeals held "that there was sufficient evidence for a rational trier of fact to find that the elements of felony-firearm were proved beyond a reasonable doubt." *Anderson*, Mich. Ct. App. No. 233212, at 5.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970). After *Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S. [276, 282 (1966)] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana,* 406 U.S. [356, 362 (1972)]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (footnote omitted) (emphasis in original).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir.), *cert. denied*, 537 U.S. 1004 (2002), *and cert. denied*, 539 U.S. 938 (2003). In Michigan,

> A conviction of felony-firearm requires proof that the defendant carried or possessed a firearm during the commission or attempted commission of a felony. Mich. Comp. Laws § 750.227b; Mich. Stat. Ann. § 28.424(2); *People v. Williams (After Remand)*, 198 Mich. App. 537, 540-41; 499 N.W.2d 404 (1993). Thus, [a] defendant may attack the sufficiency of the evidence with respect to two elements: possession and time.
>
> . . . Possession may be actual or constructive and may be proved by circumstantial evidence. *People v. Hill*, 433 Mich. 464, 469-71; 446 N.W.2d 140 (1989).

*People v. Williams*, 212 Mich. App. 607, 608-09, 538 N.W.2d 89, 90-91 (1995), *overruled on other grounds, People v. Burgenmeyer*, 461 Mich. 431, 440; 606 N.W.2d 645, 650 (2000).

> [A] person has constructive possession if there is proximity to the article together with indicia of control. *People v. Davis*, 101 Mich. App. 198; 300 N.W.2d 497 (1980). Put another way, a defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant. Physical possession is not necessary as long as the defendant has constructive possession.

*Burgenmeyer*, 461 Mich. at 438; 606 N.W.2d at 649.

Victim #1 testified on direct examination that two men kicked in the back door of her residence and came upstairs where she was lying in bed. She thought that the fat man put a gun to her head and told her to get up. The men asked where the money was and walked her to the front room and back to the bedroom where they told her to lie down. The skinny man asked the big man whether he should rape her, and the big guy said, "Yeah, why not." The skinny man then raped her as the other man walked out of her bedroom and went to her cousin's bedroom. Later, the fat man brought her cousin into the room, and the men made her look for money. When they noticed that she did not have any money, they made her put her and her boyfriend's clothes in a bag. The skinny man then walked out of her bedroom, and she did not see him anymore that night.

On cross-examination, Victim #1 testified that the skinny man put the gun to her head. When defense counsel questioned her about the inconsistency in her testimony, she claimed that she did not remember testifying earlier that she thought the fat man had held the gun to her head. Defense counsel then asked whether it was possible that she was confused about which man actually had the gun. She responded that she did not know whether she was confused, but that there definitely was a gun and one of the men put the gun to her head and made her get up. (Tr. Nov. 2, 2000, at 144-52, 162-63.)

Victim #2 testified that the fat man held a gun in his hand as he raped her and that she never saw the skinny man with a gun. However, she also testified that the two men led Victim #1 around while they looked for money. (*Id*. at 178, 173.) The police found the gun under the bed where Markevan Love was lying shortly before he was arrested. (*Id*. at 186.)

Although Victim #1 made conflicting statements about whether the fat man or the skinny man held a gun to her head, reviewing courts are not obligated to

> reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000).

*Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

A rational juror could have concluded from Victim #1's testimony that there was one gun and that the skinny man possessed the gun at one point. A rational juror could have concluded in the alternative that the skinny man had constructive possession of the gun while his accomplice held the gun. The skinny man may not have had constructive possession of the gun during the sexual assault on Victim #1, because the testimony established that the fat man left the room and proceeded to another bedroom where he pointed the gun at Victim #2. However, the skinny man apparently had constructive possession of the gun during the assault with intent to rob. The victims testified that both men forced Victim #1 to walk around looking for money. Assuming, as Petitioner does, that the fat man had possession of the gun at all times, the location of the gun surely was known to the skinny man and readily accessible to him when the two men walked Victim #1 around her

apartment looking for money.[6] Thus, the skinny man had constructive possession of a firearm during at least one of the underlying felonies.

The Court concludes that the state court's determination of the facts was not unreasonable, and its conclusion that the elements of the offense were proved beyond a reasonable doubt was not contrary to, or an unreasonable application of, *Jackson*. Although the state court did not cite

---

[6] Under the current state of law in Michigan, a rational juror also could have concluded that Petitioner aided and abetted his accomplice in possessing the gun. The Michigan Supreme Court ruled last year that, to establish felony firearm under an aiding and abetting theory

> requires proof that a violation of the felony-firearm statute was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that assisted in the commission of the felony-firearm violation, and that the defendant intended the commission of the felony-firearm violation or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement.

*People v. Moore*, 470 Mich. 56, 70-71; 679 N.W.2d 41, 50-51 (2004).

One of the defendants in *Moore* "encouraged and assisted the principal's possession of the firearm by specifically relying on that possession to intimidate his own robbery victim and by specifically ensuring that the principal would be able to successfully enter and exit the scene of the crime while carrying the firearm." *Id.*, 470 Mich. at 71; 679 N.W.2d at 51. Although the principal had actual possession of the firearm at all times, the defendant used the principal's possession of the firearm to intimidate and rob a store customer. *Id.*, 470 Mich. at 73; 679 N.W.2d at 52.

The skinny man in this case apparently relied on the fat man's possession of a gun to intimidate and assault Victim #1. Therefore, under *Moore*, the skinny man arguably aided and abetted the fat man in possessing the gun.

At the time of Petitioner's trial, however, the standard for aiding and abetting felony firearm was whether "the defendant procured, counselled, aided, or abetted and so assisted in obtaining the proscribed possession, or in retaining such possession otherwise obtained." *People v. Johnson,* 411 Mich. 50, 54; 303 N.W.2d 442, 444 (1981), overruled by *Moore*, 470 Mich. at 58, 74; 679 N.W.2d at 44, 52. There is no evidence in this case that the skinny man aided and abetted Markevan Love in obtaining or retaining possession of the gun.

17

*Jackson* in its decision, it used the same standard, as set forth in *People v. Joseph*, 237 Mich. App. 18, 20; 601 N.W.2d 882, 885 (1999).  Petitioner has no right to relief on the basis of his second claim.

## IV.  Conclusion

The state court's adjudication of Petitioner's claims on the merits was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Accordingly,

**IT IS ORDERED AND ADJUDGED** that the application for a writ of habeas corpus [Doc. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that, if Petitioner desires to seek a certificate of appealability ("COA"), he may file a **MOTION** for a COA with this Court within **THIRTY (30) DAYS** of filing a notice of appeal and shall support this motion with an appropriate brief, both of which shall comply with the Local Rules of this Court.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) (**"We do encourage petitioners as a matter of prudence to move for a COA at their earliest opportunity so that they can exercise their right to explain their argument for issuance of a COA."** (emphasis added).  Respondent may file a response with an appropriate brief, both of which shall comply with the Local Rules, within **TWENTY (20) DAYS** of service of Petitioner's motion for a COA.

    s/Paul V. Gadola
    PAUL V. GADOLA
    UNITED STATES DISTRICT JUDGE

Date: May 23, 2005

> Certificate of Service
>
> I hereby certify that on <u>May 24, 2005</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Raina I. Korbakis</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Deandre Anderson</u>.
>
>                                                         <u>s/Julia L. Delling</u>
>                                                         Julia L. Delling, Case Manager
>                                                         (810) 341-7845